**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ARKANSAS LABELING, INC.**                                                          **PLAINTIFF**

**v.**                                   **Case No. 4:19-cv-00773-KGB**

**TIM PROCTOR, LABEL EDGE, LLC,**
**GARY PARR, and GP LABELS UNLIMITED, LTD.**                   **DEFENDANTS**

**<u>ORDER</u>**

Before the Court is separate defendants Gary Parr and GP Labels Unlimited, Ltd.'s ("GP

Labels") (collectively, "Parr Defendants") motion to dismiss for lack of personal jurisdiction (Dkt.

No. 77).  Plaintiff Arkansas Labeling, Inc. ("ALI"), has responded in opposition to the motion

(Dkt. No. 80).  The Parr Defendants also submitted a reply to ALI's response (Dkt. No. 87).  For

the reasons set out below, the motion is denied (Dkt. No. 77).

**I.      Factual Background**

On November 1, 2019, ALI initiated this lawsuit against defendants Tim Proctor and Label

Edge, LLC ("Label Edge") (collectively, "Proctor Defendants"), asserting causes of action for:  (1)

conversion; (2) tortious interference with a contractual relationship or business expectancy; (3)

theft of trade secrets; (4) breach of fiduciary duty and duty of loyalty; (5) unauthorized computer

program access and theft; (6) unauthorized access to property; (7) breach of contract; (8) Arkansas

Deceptive Trade Practices Act; (9) unjust enrichment; and (10) punitive damages (Dkt. No. 2, at

9–18).  The original complaint contained allegations relating to Mr. Parr, owner of GP Labels, and

relating to GP Labels (*See, e.g.*, Dkt. No. 2, ¶¶ 18–20, 26–30, 75(c), 79).  ALI later filed an

amended complaint restating generally the same allegations as in the initial complaint but dropping

the Arkansas Deceptive Trade Practices Act claim (Dkt. No. 23).

On September 8, 2021, ALI filed a second amended complaint adding Mr. Parr and GP Labels as defendants and pleading additional facts related to these defendants (Dkt. No. 72).[1] ALI asserts the same causes of action in its second amended complaint as it pled in its amended complaint:  (1) conversion; (2) tortious interference with a contractual relationship or business expectancy; (3) theft of trade secrets; (4) breach of fiduciary duty and duty of loyalty; (5) unauthorized computer program access and theft; (6) unauthorized access to property; (7) breach of contract; (8) unjust enrichment; and (9) punitive damages (Dkt. No. 72, ¶¶ 59–113).

The following facts are taken from ALI's second amended complaint as well as the affidavits and exhibits submitted with the Parr Defendants' motion and ALI's response to the Parr Defendants' motion (Dkt. Nos. 72, 77-1, 77-2, 80-1, 80-2, 80-3, 80-5, 80-6, 80-7).

### A.      The Parties

ALI is an Arkansas corporation with its principal place of business in Saline County, Arkansas (Dkt. No. 72, ¶ 1).  Mr. Proctor is an individual resident of Texas and the owner of Label Edge, a Texas corporation with its principal place of business in San Antonio, Texas (*Id.*, ¶¶ 2–4). Mr. Parr is an individual resident of Texas and the owner of GP Labels, a Texas corporation with its principal place of business in San Antonio, Texas (*Id.*, ¶¶ 5–7).

ALI alleges that Mr. Proctor and Mr. Parr secretly developed and executed a scheme to steal ALI's confidential and proprietary information to begin directly competing with ALI (*Id.*, ¶¶ 31, 54–55).  ALI alleges that the Parr Defendants knowingly assisted, encouraged, facilitated, and

---

[1]   ALI filed its motion seeking leave to amend its complaint to add Mr. Parr and GP Labels as additional defendants based on the testimony Mr. Parr gave at a deposition on June 3, 2021 (Dkt. No. 65, ¶¶ 3–4).  According to ALI, Mr. Parr's deposition testimony suggested that Mr. Parr and GP Labels conspired with defendants Mr. Proctor and Label Edge to steal and misappropriate ALI's trade secrets (*Id.*, ¶ 3).  The Court granted ALI's motion for leave to file a second amended complaint on September 3, 2021 (Dkt. No. 71).

financed Mr. Proctor's plan to leave ALI's employ after stealing ALI's confidential and proprietary information; to create a new business in direct competition with ALI; and to further the Parr Defendants' own business interests (Dkt. No. 72, ¶¶ 29, 55, 57).

### B.    ALI's Business Operations

ALI is a graphic design business that has been in business since 1979 (*Id.*, ¶ 12).  It has a national and international customer base (*Id.*).  ALI assists its customers with creating designs for the labeling of their products and with manufacturing the product labels (*Id.*).  ALI's work covers various categories of products, including the designing, labeling, and packaging of baked goods, lunch meats, plastic bottles for beverages, firearms, cooking spices, and "almost any type of labeling one can imagine" (*Id.*).  ALI maintains that, as a result of 40 years of quality work, time, effort, and goodwill, it has developed and maintained numerous business contacts and relationships in the labeling and packing industry (*Id.*, ¶ 19).

### C.    Alleged Confidential And Proprietary Aspects Of Business

According to ALI, its business operations rely on its confidential and proprietary processes, strategies, designs, documents, product lists, supplier lists, and customer lists—all of which, ALI alleges, constitute trade secrets (*Id.*, ¶ 13).

### 1.    Label Traxx

ALI depends, in part, upon Label Traxx, a program which allows ALI to maintain its accounting records, orders of raw materials, graphic designs for customers, customer product information, and customer contact information, "among other confidential proprietary information essential to ALI's business operations" (*Id.*, ¶ 13).  Label Traxx is accessible only to ALI's graphic designers and management-level employees (*Id.*, ¶ 13).

According to ALI, the program allows ALI to track its confidential and proprietary information about when ALI's designs are created, sent to customers, approved by customers, ordered by customers, shipped to customers, and, if needed, later revised by customers (*Id.*, ¶ 14). Label Traxx stores all prior designs and labeling done by ALI for its customers and contains all of ALI's customer contact information, such as contact names, addresses, telephone numbers, and email addresses (*Id.*). ALI alleges that Label Traxx also stores confidential and proprietary information that is critical to ALI's design process for each customer's labeling and packaging, including ALI's technical drawings of its customer's Plate (the "Plate" or "Plates"), the specific tools ALI uses to create Plates for physical printing, the pantone color ALI uses with each Plate to create the customer's label, the calculations for the color scheme for ALI's customer's labels, the precise diameters of ALI's design, and the measurements necessary for ALI's equipment to produce the label (*Id.*, ¶ 15).

ALI alleges that it continuously builds upon the foundation of its information stored in Label Traxx to service customers and maintain its business relationships (*Id.*, ¶ 16).

### 2.    Customer "Plates"

In addition, ALI alleges that its customer Plates—a blueprint that allows ALI to create the labeling for its customers— are confidential and proprietary trade secrets imperative to its business operations (*Id.*, ¶ 17). ALI first designs a digital Plate for a customer, also referred to as a technical drawing (*Id.*). All Plates created by ALI contain unique design and registration markings on the "bearer bars" of the Plate (*Id.*). The "bearer bars" are located on the exterior of ALI's Plate designs (*Id.*). All Plates designed by ALI also include a unique date of design, unique part number created by ALI, and initials of ALI's graphic designer (*Id.*). The part numbers and randomized placement of the unique markings allow ALI to identify quickly each Plate it designs

and attribute the Plate to its customers (*Id.*).  ALI designs the digital Plates in Adobe Illustrator and stores the files on a private server, which is password-restricted for only ALI's graphic designers and management to access (*Id.*).

Once a customer approves the technical drawing of a Plate, ALI physically prints a single copy of the customer's Plate to use for the label-making process at ALI's facilities (*Id.*, ¶ 18).  The physical copy of a customer's Plate also contains ALI's unique design and registration markings (*Id.*).  ALI stores the single physical copy of each Plate in a restricted-access area of its facilities (*Id.*).  At no time are the Plates or technical drawings of the Plates provided to ALI's customers, in either digital or physical form, unless the customer specifically contracts and pays for the Plate and its technical drawing (*Id.*).

### D.    Mr. Proctor's Employment At ALI

Mr. Proctor was employed by ALI as a Pressman and Operations Manager from February 2001 until approximately August 2013 (*Id.*, ¶ 20).  In May 2015, Mr. Proctor was re-hired as the Sales and Operations Manager at ALI (*Id.*, ¶ 21).  ALI alleges that, during his employment, Mr. Proctor had knowledge and access to ALI's confidential and proprietary information, including all of ALI's information stored in Label Traxx, Adobe Illustrator, and its Plates (*Id.*, ¶ 22).  ALI further alleges that Mr. Proctor was exposed to ALI's customers and business contacts in the labeling and packaging industry, including Mr. Parr and GP Labels (*Id.*, ¶¶ 22–23).

### E.    Parr Defendants' 25-Year Business Relationship With ALI

ALI and the Parr Defendants were in business together for more than 25 years (Dkt. Nos. 72, ¶ 23; 80-1, at 2).  GP Labels is a "broker" between the customer, the entity that manufacturers a product, and the printer who prints labels for the customer's product (Dkt. No. 77-1, ¶ 6).  The Parr Defendants used ALI as one of their "printers" to create and produce labels for their customers

(Dkt. Nos. 77-1, ¶ 3; 77-2, at 3; 80-2, at 5–6).  None of GP Labels' customers are, or were at any time relevant to ALI's claims, located in Arkansas (Dkt. No. 77-1, ¶ 3, 5(e)).  The Parr Defendants and ALI never entered into a contract related to any matter between the parties, including the printing of labels (*Id.*, ¶ 6).

All communications were directly between the Parr Defendants and ALI, and their relationship required ongoing communications as orders were submitted and completed (Dkt. Nos. 77-1, ¶ 6; 80-2, at 2–3).  The parties frequently exchanged materials between each other, including samples of art files ALI would create into labels, order information, and approvals from customers to proceed with production (Dkt. No. 80-2, at 2–3).  Most often, the parties exchanged information and files by email (Dkt. No. 80-4, at 2–3).  Based on the unpredictable rush demand for some of the Parr Defendants' customers, ALI kept special inventory stocked at its facility (Dkt. No. 80-2, at 10–11).

After ALI had approval to proceed to production from the Parr Defendants, the entire production process occurred at ALI's facility in Arkansas (Dkt. Nos. 80-2, at 3, 12–13; 80-4, at 4). After ALI finished and shipped an order, it invoiced the Parr Defendants directly (Dkt. No. 80-5, at 2).  At this stage of the litigation on the record before it, it appears that ALI paid the Parr Defendants a ten percent commission based on the gross number of labels it produced for nearly all orders (Dkt. No. 80-1, at 2).  As early as 2021, the Parr Defendants still received a commission from ALI's work for Bolner Fiesta Products (Dkt. No. 80-2, at 5, 15).

### F.  Mr. Proctor And The Parr Defendants' Alleged Scheme To Steal ALI's Trade Secrets And Start A Competing Label Company

In December 2016, the Parr Defendants asked ALI for copies of art files designed by ALI (Dkt. Nos. 72, ¶ 24; 80-2, at 2; 80-3 at 6).  ALI refused (Dkt. No. 72, ¶ 24.).  ALI alleges that,

based on ALI's refusal to send to Mr. Parr and GP Labels art files, Mr. Parr and GP Labels asked Mr. Proctor to attempt to download the art files created by ALI (*Id.*, ¶ 25).

ALI alleges that, as early as October 2017, Mr. Proctor and Mr. Parr discussed creating a new label design and printing company in Texas despite expressly acknowledging that the new company would directly compete with ALI, Mr. Proctor's then-employer (*Id.*, ¶ 26).  On October 13, 2017, Mr. Parr emailed Mr. Proctor, stating that he "would like to speak . . . confidentially" (Dkt. No. 80-7, at 1).  On January 3, 2018, Mr. Proctor privately emailed Mr. Parr and asked whether Mr. Parr was serious in asking if Mr. Proctor "would run one with" him (*Id.*, at 2).  In February 2018, Mr. Proctor met with Mr. Parr and his wife, Nancy Parr,[2] to discuss their plans to form a new business in direct competition with ALI (Dkt. No. 72, ¶ 27).  Throughout the following months, Mr. Proctor and Mr. Parr exchanged multiple emails about their plans to form a new business in direct competition with ALI (Dkt. No. 72, ¶¶ 27–28).

On March 6, 2018, Mr. Proctor emailed Mr. Parr after having attempted to call Mr. Parr (Dkt. No. 80-7, at 3).  Mr. Proctor stated that he would take his lunch break the next day to call (*Id.*).  The next day, Mr. Parr emailed Mr. Proctor stating that they were "in the very early stages of thinking about next year," specifically "what it would look like to open a print shop here, . . . or if there is another plan that would be more advantages [sic]" (Dkt. No. 80-7, at 3).  Mr. Parr told Mr. Proctor:

> The only way I would open a print shop here for labels if [sic] you were running it.
> That would take a large investment in equipment and people.  I need to find out
> what it would take to get you here to do that plus how Arkansas would respond if
> that [sic] you came to work for me.  Then put all the numbers together and a plan
> of how to do that.

---

[2]  Nancy Parr is a co-owner of GP Labels, but she is not a party in this action (Dkt. No. 77-1, at 1).

These are some of the things we need to discuss moving forward.  Not get ahead of ourselves but make sure we make the right decisions for everyone involved.  I do not want to do anything that would put you or us in a bad place.

(*Id.*).

One week later, on March 13, 2018, Mr. Proctor emailed Mr. Parr, stating that things at ALI were "starting to head in the direction [he] thought they would, . . . and household stuff is being sold off this next weekend" (*Id.*, at 5).  Mr. Proctor stated that he thought he and his wife "6 months from now [would] be on to other things besides here" (*Id.*).

During this same time period, Mr. Proctor—at the Parr Defendants' request—started downloading ALI's art files to see "how much space it would take on a drive and how long it would take to do it" (Dkt. Nos. 72, ¶ 30; 80-3, at 5–6,).  According to ALI, Mr. Proctor knew that ALI had refused to send these art files to the Parr Defendants on multiple occasions, but he continued to download the art files without ALI's knowledge or authorization at the Parr Defendants' request (Dkt. No. 72, ¶ 30).

In June 2018, Mr. Parr incorporated an entity identified as "Label Edge, Inc." with the Texas Secretary of State (Dkt. No. 72, ¶ 31).  ALI alleges that, between June 2018 and September 2018, the Parr Defendants developed a plan with Mr. Proctor to create Label Edge to compete directly with ALI (*Id.*, ¶ 32).  According to ALI, the Parr Defendants promised Mr. Proctor that they would provide business previously done by ALI to Label Edge if this new business was formed in San Antonio, Texas (*Id.*, ¶ 33).

In September 2018, Mr. Proctor left his employment with ALI (*Id.*, ¶ 34).  In October 2018, Mr. Proctor registered Label Edge with the Texas Secretary of State (*Id.*, ¶ 35).  The timeline of these events corresponded with the previously identified six-month window Mr. Proctor referenced in his email to Mr. Parr on March 13, 2018 (Dkt. No. 80-7, at 5).

Upon Mr. Proctor's termination, ALI demanded the return of the company laptop (Dkt. No. 72, ¶ 36).  According to ALI, investigation into the laptop revealed that following his termination, but prior to returning the laptop to ALI, Mr. Proctor uploaded all of ALI's information stored in Label Traxx to a Cloud account, an online-based storage account (*Id.*).  ALI alleges that, upon further investigation, ALI learned that Mr. Proctor also transferred ALI's information from Label Traxx to multiple removable USB storage devices throughout 2018 (*Id.*).  ALI alleges that, after uploading, copying, and stealing ALI's confidential proprietary information, Mr. Proctor attempted to hide evidence of his conduct by deleting all files, as well as his communications with Mr. Parr and GP Labels, from the laptop (*Id.*, ¶ 38).  ALI further alleges that the Parr Defendants knew of Mr. Proctor's attempts to delete evidence with regard to his theft of ALI's proprietary and confidential information and encouraged Mr. Proctor to do so (*Id.*, ¶ 39).

According to ALI, Mr. Proctor took ALI's customer contacts, designs, product specifications, Plates, and other confidential and proprietary information from Label Traxx with the intent of contacting these customers for the benefit of Mr. Proctor and the Parr Defendants' newly planned business venture (*Id.*, ¶ 40).  ALI alleges that, armed with this information, Mr. Proctor could shortcut the extensive time and money expended by ALI to collect and develop this specialized knowledge to duplicate a customer's Plate file and begin the physical label-making process (*Id.*, ¶ 37).  ALI alleges that using this information allowed Mr. Proctor and Label Edge to compete directly with ALI within months of starting the new company (*Id.*).

In December 2018, Mr. Parr had a meeting with Rodney Harris, President of ALI, in which Mr. Parr told Mr. Harris that business between GP Labels and ALI was good and that he expected their business together to continue as usual (*Id.*, ¶ 41).  Shortly thereafter, Mr. Harris learned that Mr. Proctor was operating Label Edge; that Mr. Proctor had started operating Label Edge one

month after he left ALI; and that Mr. Proctor had opened Label Edge with the Parr Defendants'
help (*Id.*).  ALI alleges that, after December 2018, ALI's business with the Parr Defendants
significantly decreased, and by September 2019, business between ALI and the Parr Defendants
had come to a complete halt, except for minor work for one account (*Id.*, ¶ 42).  According to Mr.
Parr, GP Labels stopped utilizing ALI's printing services in 2019 after it unilaterally changed its
pricing terms (Dkt. No. 77-1, ¶ 6).

ALI alleges that, in the time since December 2018, Mr. Proctor and Label Edge have
utilized ALI's stolen trade secrets, including the designs, production specifications, and Plates, to
make labels for GP Labels instead of ALI (Dkt. No. 72, ¶ 43).  ALI alleges that, since December
2018, the bulk of Label Edge's business has been with GP Labels (*Id.*).

According to ALI, the Parr Defendants knowingly used the confidential and proprietary
information stolen from ALI by Mr. Proctor also to compete unfairly and directly with ALI (*Id.*, ¶
44).  Mr. Parr testified in his deposition that, after Label Edge opened, he instructed Mr. Proctor
"to use the same part number [on ALI's files] but put an 'LE' in front of it, Label Edge . . . so [he]
would know which company [he] ordered that label from" (Dkt. Nos. 72, ¶ 45; 80-2, at 6–7).  Mr.
Parr also testified that GP Labels does not use the same part numbers for its work with any other
printing companies because GP Labels does not have two printers "that have the capabilities to
print the same label" (*Id.*).  ALI maintains that, as of February 3, 2019, if not earlier, all Defendants
utilized ALI's trade secrets to begin immediately competing with ALI by producing identical
"Coffee Cake" labels for Hill Country Bakery LLC (also referred to as "FGF") (Dkt. No. 72, ¶
46).[3]  Further, on September 23, 2019, Mr. Parr directly emailed April Fowler, a former office

---

[3]  On May 31, 2018, ALI designed "Coffee Cake" labels for FGF, and the "Coffee Cake"
Plate was finalized on or about June 22, 2018, by a graphic designer at ALI (Dkt. No. 72, ¶ 46
(citing "Exhibit A" at 22)).  For comparison, ALI submits a technical drawing of a nearly identical

manager and designer at ALI, at her ALI email address, requesting her assistance in revising a "Red Velvet" label for FGF—a plate previously designed and prepared by ALI in September 2018 (*Id.*, ¶ 47). ALI alleges that Ms. Fowler has been periodically assisting Mr. Proctor with designs for Label Edge and, as a result, also benefiting the Parr Defendants (*Id.*).

As recently as July 2020, the Parr Defendants have had an employee working some at Label Edge's facility in San Antonio, Texas (*Id.*, ¶ 48). The Parr Defendants' employee has her own desk, chair, and computer, and picks up orders for GP Labels at Label Edge (*Id.*). ALI alleges that the employee has allegedly transferred, and continues to transfer, ALI's stolen confidential and proprietary information from the Proctor Defendants' electronic devices to devices owned by the Parr Defendants to use ALI's trade secrets for the benefit of all Defendants (*Id.*, ¶ 49). ALI further alleges that the Parr Defendants' employee working at Label Edge's facility has shared, and continues to share, ALI's confidential and proprietary information with third parties, including but not limited to sending ALI's digital Plates to Ms. Fowler so that all Defendants can quickly duplicate Plates designed by ALI to compete directly with ALI (*Id.*, ¶ 50).

ALI maintains that all Defendants are soliciting employees of ALI to leave ALI and work for Label Edge, either as employees or independent contractors (*Id.*, ¶ 56). All ALI employees, including Mr. Proctor, signed a non-compete agreement each year during their annual employment evaluation, which typically occurred each January (*Id.*, ¶ 52). According to ALI, Mr. Proctor's most recently signed non-compete agreements, as well as many other former ALI employees' non-compete agreements, are missing from ALI's files (*Id.*, ¶ 53). As Operations Manager at ALI, Mr.

---

"Coffee Cake" Plate that Label Edge produced for FGF on February 3, 2019 (*Id.* (citing "Exhibit B" at 23). ALI highlights that the only differences between Exhibit A and Exhibit B are that Label Edge altered the unique registration marking from ALI's "Coffee Cake" Plate, changed the date of initial and changed the initials from "vs" (a graphic designer at ALI) to "TP" (Tim Proctor) (*Id.*).

Proctor supervised most human resources duties for ALI and had privileged building access to the storage area for employee files that contain, among other information, non-compete agreements signed by ALI employees over the past several years (*Id.*, ¶ 51). ALI maintains that Mr. Proctor improperly utilized his privileged access prior to returning his keys to steal and/or destroy many of ALI's current non-compete agreements in furtherance of Defendants' plan to steal ALI's confidential and proprietary information and directly compete with ALI (*Id.*, ¶ 53).

ALI alleges that the Parr Defendants assisted and financed Mr. Proctor's conduct for purposes of using ALI's stolen confidential and proprietary information to compete directly with ALI (*Id.*, ¶ 55). ALI alleges that the Parr Defendants are receiving this information from Mr. Proctor, which they knew was illegally taken from ALI, and using it to compete directly against ALI (*Id.*, ¶ 57). In addition to the direct theft of ALI's confidential and proprietary information, ALI alleges that the conduct of all Defendants has resulted in immediate loss of profits, future lost profits, and destruction of ALI's customer relationship and trust (*Id.*, ¶ 58).

## II.     Legal Standards

### A.     Federal Rule Of Civil Procedure 12(b)(2)

Rule 12(b)(2) of the Federal Rules of Civil Procedure provides that a party may move to dismiss claims for lack of personal jurisdiction over the person. Fed. R. Civ. P. 12(b)(2). "To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a *prima facie* showing of personal jurisdiction over the defendant." *Digi-Tel Holdings v. Proteq Telecomms.*, 89 F.3d 519, 522 (8th Cir. 1996) (citing *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir. 1995)). The plaintiff "must state sufficient facts in the complaint to support a reasonable inference that defendants may be subjected to jurisdiction in the forum state." *Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir.

2008).  The plaintiff's *prima facie* showing "must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto."  *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (citations omitted).  Although the plaintiff bears the ultimate burden of proof, personal jurisdiction over the defendant need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing.  *See Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991) (citing *Cutco Ind. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)).  "If the district court does not hold a hearing and instead relies on pleadings and affidavits . . . the court must look at the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in favor of that party."  *Id.* (citations omitted).  "The party seeking to establish the court's in personam jurisdiction carries the burden of proof, and the burden does not shift to the party challenging jurisdiction."  *Epps v. Stewart Inform. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003) (citations omitted).

### B.    Due Process Clause Of The Fourteenth Amendment

"In a diversity action, a federal court may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state, and by the due process clause of the Fourteenth Amendment."  *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996).  Arkansas' long-arm statute allows personal jurisdiction "to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution."  Ark. Code Ann. § 16–4–101(B).  Because Arkansas' long-arm statute confers jurisdiction to the fullest constitutional extent, the Court's inquiry is limited to whether the exercise of personal jurisdiction comports with due process.  *See Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 818 (8th Cir. 1994); *Davis v. St. John's Health Sys., Inc.*, 348 Ark. 17, 71 S.W.3d 55, 58 (Ark. 2002).

"Due process requires 'minimum contacts' between [a] non-resident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Burlington Indus.*, 97 F.3d at 1102 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92(1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Minimum contacts must exist either at the time the cause of action arose, the time the suit was filed, or within a reasonable period of time immediately prior to the filing of the lawsuit. *Pecoraro v. Sky Ranch For Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003).  The touchstone inquiry is whether a defendant's conduct and connection with the forum state is such that the defendant should "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.*, 444 U.S. at 297.  "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction as a result of 'random,' 'fortuitous,' or 'attenuated,' contacts." *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1176 (E.D. Ark. 2019) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

The Eighth Circuit Court of Appeals has identified five factors to consider when determining the sufficiency of a defendants' contacts with the forum state:  "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum; (3) the relation of the cause of action to these contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties."  The first three factors are closely related and can be considered together. *Digi-Tel Holdings*, 89 F.3d at 522–23.  They are also the most important factors. *See Burlington Indus.*, 97 F.3d at 1102.

14

Courts have elaborated on the third factor—the relationship of the cause of action to the contacts—to distinguish between general, sometimes called all-purpose, and specific, sometimes called case-linked, jurisdiction.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir. 1994) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984)).  "General jurisdiction . . . refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose."  *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir. 1993).  General jurisdiction is appropriate for a non-resident corporate defendant whenever a corporate defendant's "affiliations with the [forum] are so continuous and systematic as to render it essentially at home in the forum State."  *Daimler AG v. Bauman,* 571 U.S. 117, 138–39 (2011).  "[T]he paradigm forum" for the exercise of personal jurisdiction over an individual is the individual's domicile.  *Id.*, at 137.  Typically, a corporate defendant is "essentially at home" in the state of its incorporation or in the state in which it has its principal place of business.  *Id.*

Specific jurisdiction, on the other hand, is proper "only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities."  *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008) (citing *Burger King*, 471 U.S. at 472).  The Supreme Court recently clarified how courts should determine if an injury "arise[s] out of or relate[s] to" a defendant's contacts with the forum in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1026 (2021).  In *Ford*, the Supreme Court bifurcated the arising out of or relating to inquiry and directed lower courts to allow an assertion of personal jurisdiction when a suit either:  (1) arises out of the defendant's contacts with the forum, as in the

15

defendant's contacts caused the alleged injury, or (2) the defendant's contacts related to the alleged injury, as in the defendant had a "strong 'relationship . . . [to] the forum.'" *Id.*, at 1026–28.

When defendants avail themselves "of the privilege of conducting business" in the forum state such that their "activities are shielded by the 'benefits and protections' of the forum's laws, it is presumptively not unreasonable to require [them] to submit to the burdens of litigation in that forum as well." *Burger King*, 471 U.S. at 476.   Moreover, as relayed in *Burger King*, actual physical presence in the forum state is not the *sine qua non* of specific personal jurisdiction:

> [J]urisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State.   Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.   So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id.* (emphasis in original).

Although mail, fax, and telephone communications do not alone establish personal jurisdiction, "in conjunction with other contacts they may support the exercise of personal jurisdiction." *Northrup King*, 51 F.3d at 1388; *see also Acxiom Corp. v. Briggs*, Case No. 4:12-cv-00165 SWW, 2012 WL 5185870, at *4 (E.D. Ark. Oct. 18, 2012) ("[C]ommunications directed to Arkansas via email and telephone do not alone satisfy due process requirements, but they count toward minimum contacts that support personal jurisdiction.").

Another means to obtain specific jurisdiction includes employing the *Calder* effects test. *See Calder v. Jones*, 465 U.S. 783 (1984).   When an intentional tort is alleged, the assertion of personal jurisdiction over a nonresident defendant is allowed if that defendant's actions "are performed for the very purpose of having their consequences felt in the forum state." *Johnson v.*

16

*Arden*, 614 F.3d 785, 796 (8th Cir. 2010) (citations omitted).  This test, however, "is merely an additional factor to consider when evaluating a defendant's relevant contacts with the forum state." *Id.* at 796–97.  The test is construed narrowly, for "absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction."  *Id.*, at 797.  Further, "it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State." *Walden v. Fiore*, 571 U.S. 277, 291 (2014).

A court may exercise personal jurisdiction over defendants through the acts of their agents. *Romak USA, Inc. v. Rich*, 384 F.3d 979, 985 (8th Cir. 2004).  "A party who relies upon the authority of an agent has the burden of proof regarding both the fact of the agency relationship and the scope of the agent's authority."  *Id.* (citing Missouri case and relying on Missouri law of agency in a dispute regarding whether a federal district court in Missouri had personal jurisdiction).   Under Arkansas law, "[t]he two essential elements of an agency relationship are (1) that an agent have the authority to act for the principal, and (2) that the agent act on the principal's behalf and be subject to the principal's control."  *Bullock's Kentucky Fried Chicken, Inc. v. City of Bryant*, 582 S.W.3d 8, 12 (Ark. 2019) (citing *Pledger v. Troll Book Clubs, Inc.*, 871 S.W.2d 389, 392 (Ark. 1994)).

### III.   Analysis

ALI does not contend that the Court has general jurisdiction over the Parr Defendants (Dkt. No. 80, at 6 n.2).  The Court agrees:  Mr. Parr is a resident of Texas, and GP Labels' corporate headquarters and principal place of business is also in Texas (Dkt. No. 77-1, at 1).  The Court examines whether ALI has met its burden of demonstrating sufficient minimum contacts for this Court to exercise specific personal jurisdiction over Mr. Parr and GP Labels.  *See First Nat'l Bank of Lewisville v. First Nat'l Bank of Clinton*, 258 F.3d 727 (8th Cir. 2001).

The Parr Defendants argue that neither Mr. Parr nor GP Labels have meaningful contacts with Arkansas and, to the extent contacts exist, none of ALI's claims arise out of or relate to those contacts (Dkt. No. 77, at 9, 12).  The Parr Defendants emphasize that they do not own or have an interest in personal property or real property, including leases; employ any persons; maintain offices; have inventory; or maintain bank accounts within the State of Arkansas (Dkt. Nos. 72, ¶¶2–4; 77-1, ¶¶ 5(a)–(d), (g)).

ALI responds that specific jurisdiction exists because the dispute arises from a business relationship maintained over 25 years between the Parr Defendants and ALI, an Arkansas resident, and the alleged tortious conduct taken by the Parr Defendants and Mr. Proctor toward ALI in Arkansas (Dkt. No. 80, at 6–7).  ALI responds that specific jurisdiction is proper based on "the extensive business relationship that the Parr Defendants formed with ALI over 25 years, their communication with Mr. Proctor while he was employed by ALI and living in Arkansas regarding starting a competing company, the admitted downloading of ALI's files, and the Parr Defendants' continuing use of Fowler as a graphic artist living in Arkansas" (Dkt. No. 80, at 4).

On the record before the Court, the first step of the jurisdictional inquiry is satisfied.  Arkansas Code Annotated § 16–4–101(B) permits courts to exercise personal jurisdiction over all parties "to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution."

The Court must next determine if the Parr Defendants have the necessary minimum contacts with the forum so as to not offend the Due Process Clause of the Fourteenth Amendment.  The Court does this by applying the Eighth Circuit's five factor personal jurisdiction test.  *Burlington Indus.*, 97 F.3d at 1102.  That test includes examining:  (1) the nature and quality of the contacts, (2) the quantity of the contacts, (3) the relationship of the cause of action to the

18

contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience or inconvenience of the parties.  *Id*.

        A.        **Nature And Quality Of Contacts With The Forum State, Quantity Of Those Contacts, And The Relation Of The Cause Of Action To Those Contacts**

The first three factors from the operative *Burlington* test are:  (1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; and (3) the relation of the cause of action to the contacts.  *Burlington Indus.*, 97 F.3d at 1102.  These factors are closely related and can be considered together.  *Digi-Tel Holdings*, 89 F.3d at 522–23.

The record before the Court indicates that ALI's cause of action arises out of the Parr Defendants' contacts with the forum—namely, a business relationship with an Arkansas business maintained over 25 years.  Based on the record before the Court, that relationship consisted of the Parr Defendants reaching out to ALI in Arkansas to initiate the business each time the Parr Defendants selected ALI for a print job.  There is record evidence that the ultimate customer sent to the Parr Defendants the request for labels, including specifications as to color, type of printing, and turnaround time, as well as price (Dkt. No. 80-2, at 12).  The Parr Defendants then selected the printer, and many times selected ALI, located in Arkansas, for the work (*Id.*).   All communications were directly between the Parr Defendants and ALI, and their relationship required ongoing communications as orders were submitted and completed (Dkt. Nos. 77-1, ¶ 6; 80-2, at 2–3).

Based on record evidence, in most instances, ALI creates a proof, sends it to the Parr Defendants, and the Parr Defendants send it to the ultimate customer, which then approves the proof, sends the approval to the Parr Defendants, and the Parr Defendants send the approved proof to ALI (Dkt. No. 80-2, at 12–13).  The parties frequently exchanged materials between each other, including samples of art files ALI would create into labels, order information, and approvals from

customers to proceed with production (*Id.*, at 2–3).  Most often, the parties exchanged information and files by email (Dkt. No. 80-4, at 2–3).

After ALI had approval to proceed to production from the Parr Defendants, the entire production process occurred at ALI's facility in Arkansas (Dkt. Nos. 80-2, at 3, 12–13; 80-4, at 4). The proof is used to generate and create labels in Arkansas, that are packed and shipped from Arkansas, and that are not shipped to the ultimate customer by ALI but are shipped to GP Labels by ALI, based on the record evidence before the Court (Dkt. No. 80-2, at 13–14).  Based on the unpredictable rush demand for some of the Parr Defendants' customers, ALI kept special inventory stocked at its facility in Arkansas (Dkt. No. 80-2, at 10–11).  After ALI finished and shipped an order, it invoiced the Parr Defendants directly (Dkt. No. 80-5, at 2).

At this stage of the litigation on the record before it, it appears that ALI paid the Parr Defendants a ten percent commission based on the gross number of labels it produced for nearly all orders (Dkt. No. 80-1, at 2).  As early as 2021, the Parr Defendants still received a commission from ALI's work for Bolner Fiesta Products (Dkt. No. 80-2, at 5, 15).

The causes of action against the Parr Defendants arise from this on-going business relationship.  Record evidence suggests Mr. Parr regularly acted on behalf of himself and the Parr Defendants when transacting business with ALI.

ALI also bases its claims on allegations that the Parr Defendants developed and executed a scheme to steal ALI's confidential and proprietary information to further their own business interests and start a new business in direct competition with ALI (Dkt. No. 72, ¶¶ 42–44).  There are allegations in the operative complaint, and some support in the record evidence, that Mr. Proctor, while purportedly employed by ALI, took direction and performed actions on behalf of Mr. Parr and GP Labels to further the business interests of Mr. Parr and GP Labels.  Based on

ALI's allegations, when ALI did not provide electronic art files to the Parr Defendants at Mr. Parr's request, Mr. Parr instructed Mr. Proctor to download ALI's art files while Mr. Proctor was employed by ALI in Arkansas and working in Arkansas, and the Parr Defendants have knowingly used the confidential and proprietary information stolen from ALI in Arkansas to compete directly with ALI (Dkt. No. 72, ¶ 30).  As a result of this conduct, ALI's business with the Parr Defendants significantly decreased after Label Edge began its operations and eventually came to a complete halt except for minor work for one account (*Id.*, ¶ 42).  ALI maintains that the Parr Defendants knowingly undertook such actions (Dkt. No. 72, ¶ 29).

Although the Parr Defendants attempt to characterize the record before the Court as containing "conclusory, presumptive allegations," (Dkt. No. 77, at 2), ALI has produced, and the record before the Court includes, multiple email exchanges, exhibits, and excerpts from deposition testimony to support ALI's claims.  Accepting ALI's allegations as true at this stage of the proceedings, the Parr Defendants had an on-going business relationship with ALI in which the Parr Defendants sought out ALI in Arkansas; contacted and regularly communicated with ALI in Arkansas; understood the work that was the subject of the business relationship would be performed in Arkansas, including but not limited to the design of labels, the production of labels, and the packaging for shipment of labels; and received payment from ALI in Arkansas.  Further, accepting ALI's allegations as true at this stage of the proceedings, the Parr Defendants knowingly assisted, encouraged, facilitated, and financed Mr. Proctor's plan to leave ALI after stealing its confidential and proprietary information and to create a new business in direct competition with ALI.  Mr. Proctor was employed by ALI in Arkansas and purportedly stole the confidential and proprietary information from ALI in Arkansas at the direction of and for the benefit of the Parr Defendants.

Considering the totality of the circumstances in this case, this Court concludes that the nature, quality, and quantity of the Parr Defendants' contacts with Arkansas are substantial enough to confer personal jurisdiction at this stage of the litigation.  Having examined the allegations in the operative complaint and the record evidence before the Court, the Court makes this determination both as to Mr. Parr individually and as to GP Labels.  Mr. Parr and GP Labels purposefully availed themselves of the benefits and protections of Arkansas law and should reasonably anticipate being haled into court in Arkansas.

Because personal jurisdiction must be determined on a claim-by-claim basis, the Court next examines specific jurisdiction with respect to each of ALI's substantive claims.  *See Vallone v. CJS Solutions Gp., Inc.*, 9 F.4th 861, 865 (8th Cir. 2021).  In reaching its conclusions in this case, the Court has studied all legal authorities cited and argued by the parties in their filings, along with all record evidence submitted to the Court to date.

### 1.    Conversion Claim

In Count I of its second amended complaint, ALI alleges that it has an ownership interest in its confidential and proprietary information, including information maintained in Label Traxx, and its private server containing Adobe Illustrator files for ALI's digital Plates (Dkt. No. 72, ¶ 60).  ALI alleges that defendants intentionally seized control over ALI's confidential and proprietary information and that defendants' interference with ALI's rights in its confidential and proprietary information has deprived ALI of its valuable business assets (*Id.*, ¶¶ 61–62).  ALI alleges that defendants' intentionally converted ALI's assets for their own use, benefit, and profit (*Id.*, ¶ 62).

The Parr Defendants assert that there are "no allegations that Mr. Parr and GP Labels had *any contact* with the State of Arkansas . . . [and that the] *only* contact with Arkansas is its prior relationship with [ALI]."  (Dkt. No. 77, at 13–14).  According to the Parr Defendants, "GP Labels

was merely a broker between product manufacturers in need of labels and printers for those labels—it did not do business in Arkansas." (Dkt. Nos. 77, at 14; 77-1, ¶¶ 3–4, 5(a)–(g)).  The Parr Defendants continue to assert that "even if its brokerage relationship with [ALI] *was* a 'contact' with Arkansas, the forum State, as opposed to merely with Plaintiff, as a resident of the forum State, that contact is wholly unrelated to the claim for conversion. . . The conversion claim does not arise out of or relate to GP Labels brokering label print jobs for end-users—none of which were ever located in Arkansas." (Dkt. Nos. 77, at 14; 77-1, ¶¶ 3, 5(e)).

For the reasons explained in this Order, the Court rejects the Parr Defendants' attempts to recast the business relationship with ALI and their attempts to recast the nature of the actual transactions engaged in for decades with ALI.  The basis of the conversion claim in this case, at least at this stage of the litigation, arises out of the Parr Defendants' ongoing business relationship with ALI and direct communications with Mr. Proctor, a then-purported employee of ALI working and living in Arkansas, who is alleged to have acted for the direct benefit of and at the direction of the Parr Defendants when purportedly downloading files in Arkansas that ALI claims were proprietary and confidential.  The Court denies the Parr Defendants' motion to dismiss this claim for lack of personal jurisdiction.

### 2. Tortious Interference With A Contractual Relationship Or Business Expectancy Claim

ALI's second claim asserts that the Parr Defendants had knowledge of ALI's contractual relationships or business expectancies through nearly 25 years of doing business with ALI and that defendants' intentional and improper interference induced or caused a disruption or termination of ALI's contractual relationships or business expectancies (Dkt. No. 72, ¶¶ 66, 68).  ALI alleges that defendants have shared ALI's confidential and proprietary information to ALI's direct competitors and have intentionally and improperly diverted existing customers away from ALI (*Id.*, ¶ 67).

23

In support of their motion to dismiss for lack of personal jurisdiction as to this claim, the Parr Defendants argue that Mr. Parr and GP Labels "neither knew of nor w[ere] involved in ALI's business relationships outside of the business GP Labels brokered, [Mr. Parr and GP Labels'] purported knowledge *only* extended to [ALI's] business relationships with end-users facilitated by GP Labels[,] . . . [that] none of these customers were located in Arkansas[,] . . . [that] any purported interference would have been instigated by [Mr. Parr and GP Labels] in Texas . . . and directed at business *outside of Arkansas*" (Dkt. Nos. 77, at 15; 77-1, ¶¶ 3, 5(e), 7)

For the reasons explained in this Order, the Court rejects the Parr Defendants' arguments. When the Parr Defendants engaged the services of ALI on behalf of clients outside of Arkansas, the Parr Defendants solicited ALI in Arkansas to perform the work, communicated with ALI in Arkansas, and a majority of the services were performed by ALI in Arkansas. The Parr Defendants were paid regularly by ALI in Arkansas for this work. The tortious interference claims arise out of this business relationship. Further, ALI alleges that the Parr Defendants' intentional and improper interference was directed at ALI in Arkansas; that, at least in part, acts were engaged in by Mr. Proctor while then an ALI employee, purportedly acting at the direction of and on behalf of the Parr Defendants, in Arkansas that give rise to this claim; and the effects of the tortious interference have allegedly been felt in Arkansas. Given the nature and extent of the parties' business relationship and the allegations in this case, and giving ALI due deference on this motion to dismiss, the Court finds this claim as to the Parr Defendants should not be dismissed for lack of personal jurisdiction at this stage of litigation.

### 3.    Theft Of Trade Secrets Claim

In Count III of its second amended complaint, ALI alleges that its confidential and proprietary information, including part numbers, customer lists, designs, product lists, supplier

lists, product specifications, and Plate designs, are "trade secrets" (Dkt. No. 72, ¶ 71).  ALI alleges that defendants have acquired through improper means and misappropriated ALI's trade secrets by intentionally converting ALI's confidential and proprietary information, including the information contained in Label Traxx and Adobe Illustrator (*Id.*, ¶ 73).

In support of their motion to dismiss for lack of personal jurisdiction, the Parr Defendants argue that "this purported misappropriation occurred only by way of Proctor . . . Any purported use, and thereby misappropriation, of 'confidential and proprietary information' by [Mr. Parr and GP Labels] occurred *after* Proctor established Label Edge *in Texas"* (Dkt. No. 77, at 16).

Based on ALI's allegations and the record evidence before the Court, Mr. Parr, on behalf of himself and GP Labels, instructed Mr. Proctor, who was working in Arkansas, to download ALI's art files that were located in Arkansas while Mr. Proctor was employed by ALI in Arkansas, and the Parr Defendants have knowingly used the confidential and proprietary information stolen from ALI to compete directly with ALI (Dkt. No. 72, ¶ 30).  Some record evidence supports these allegations.  As a result of this conduct, ALI alleges that ALI's business with the Parr Defendants significantly decreased after Label Edge began its operations and eventually came to a complete halt except for minor work for one account (*Id.*, ¶ 42).  The Court denies the Parr Defendants' motion to dismiss this claim for lack of personal jurisdiction.

### 4.    Breach Of Fiduciary Duty Of Loyalty Claim

ALI's claim for breach of fiduciary duty and duty of loyalty alleges that, Mr. Proctor was entrusted with confidential and proprietary information as Operations Manager and generally as an employee of ALI, and that Mr. Proctor breached his duty of loyalty and fiduciary duty to act in good faith when he provided ALI's confidential and proprietary information to the Parr Defendants and others (Dkt. No. 72, ¶¶ 80–81).

In support of their motion to dismiss for lack of personal jurisdiction, the Parr Defendants assert that this claim does not allege any wrongdoing on the part of Mr. Parr and GP Labels, that it seeks relief only from Mr. Proctor, and that the Court should decline to exercise personal jurisdiction over defendants with respect to this claim (Dkt. No. 77, at 16–17).  For the same reasons explained in this Order as to the other claims alleged by ALI, the Court denies the Parr Defendants' motion to dismiss this claim for lack of personal jurisdiction to the extent ALI brings this claim against the Parr Defendants.

### 5.    Unauthorized Computer Program Access And Theft Claim

ALI's unauthorized computer program access and theft claim asserts, in relevant part, that the Parr Defendants, by "knowingly transferring, receiving, retaining, copying, and using ALI's stolen information without authorization from ALI, . . . have engaged in criminal conduct" (Dkt. No. 72, ¶ 90).

The Parr Defendants maintain, in support of their motion to dismiss for lack of personal jurisdiction, that "this claim too relies on Proctor as the intermediary linking purportedly unlawful conduct with Defendants." (Dkt. No. 77, at 17).  Having examined the allegations and record evidence before it, for the same reasons explained in this Order as to the other claims alleged by ALI, the Court denies the Parr Defendants' motion to dismiss this claim for lack of personal jurisdiction.

### 6.    Unauthorized Access To Property Claim

ALI's unauthorized access to property claim asserts that Label Edge, Mr. Parr, and GP Labels are jointly liable by knowingly directing or assisting Mr. Proctor (Dkt. No. 72, ¶ 95).

The Parr Defendants argue that "there is no allegation that *defendants* had any contacts with Arkansas" (Dkt. No. 77, at 18).  For the same reasons explained in this Order as to the other

claims alleged by ALI, the Court denies the Parr Defendants' motion as to this claim.  Given the nature and extent of the parties' business relationship and the allegations in this case, and giving ALI due deference on this motion to dismiss, the Court finds this claim as to the Parr Defendants should not be dismissed for lack of personal jurisdiction.

### 7.   Breach Of Contract Claim

In Count VII of it second amended complaint, ALI claims that Mr. Proctor, while still employed by ALI, breached his non-compete agreement by, for example, secretly developing a scheme with the Parr Defendants to start Label Edge and take business from ALI and sharing ALI's confidential and proprietary information with clients, customers, vendors, or contacts in the labeling business (Dkt. No. 72, ¶ 103(b)–(c)).  The Court does not understand this to be a claim asserted against the Parr Defendants but instead to be brought only against Mr. Proctor.  As a result, the Court denies as moot the Parr Defendants' motion to dismiss this claim for lack of personal jurisdiction.

### 8.   Unjust Enrichment Claim

ALI's unjust enrichment claim alleges that defendants have used ALI's confidential and proprietary information to further their own personal interests (Dkt. No. 72, ¶ 107).  ALI alleges that defendants have stolen and weaponized ALI's trade secrets and goodwill to the detriment of ALI (*Id.*, ¶ 108).

For the same reasons explained in this Order as to the other claims alleged by ALI, the Court denies the Parr Defendants' motion as to this claim.  Given the nature and extent of the parties' business relationship and the allegations in this case, and giving ALI due deference on this motion to dismiss, the Court finds this claim as to the Parr Defendants should not be dismissed for lack of personal jurisdiction.  To the extent the Parr Defendants argue, in support of their motion

to dismiss for lack of personal jurisdiction, that "Defendants' inferred contacts with Arkansas are even more strained because the claim is also contingent on Defendants' use of that information" (Dkt. No. 77, at 19), there is record evidence before the Court to support ALI's allegations with respect to each of the Parr Defendant's actions and involvement in the longstanding business relationship with ALI, the efforts directed to Arkansas and actions taken in Arkansas at the alleged direction of the Parr Defendants to take ALI's confidential and proprietary information developed through that longstanding business relationship to further each of the Parr Defendant's own personal interests, and the use by the Parr Defendants of that information during the course of their business.

### B. Interest Of the Forum State In Providing A Forum For Its Residents And Convenience Of The Parties

The last two *Burlington* factors, which the Eighth Circuit deems of least importance in comparison to the first three, are "(4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." 97 F.3d at 1102.

As to the fourth factor, Arkansas has an interest in providing a forum for ALI, a resident corporation. *K–V Pharm. Co. v. J. Uriach & CIA, S.A.,* 648 F.3d 588, 595 (8th Cir. 2011). ALI's allegations and the record currently before the Court suggest that the Parr Defendants "purposefully direct[ed]" their actions toward Arkansas for a number of decades and especially with respect to its most recent alleged conduct, and the Court believes that Arkansas "has a 'manifest interest' in providing a convenient forum for redressing injuries [allegedly] inflicted" by the Parr Defendants. *Burger King Corp.*, 471 U.S. at 473. That "manifest interest," including the alleged direct theft of ALI's confidential and proprietary information and the alleged destruction of ALI's customer relationship and trust, in the Court's view, all weigh in favor of finding that defendants have the necessary minimum contacts with Arkansas. *Id.*

Viewing the facts and allegations in the light most favorable to ALI and resolving all factual conflicts in its favor, as this Court is required to do at this stage, the Court concludes that the last two *Burlington* factors weigh in favor of this Court exercising personal jurisdiction over the Parr Defendants and that the Parr Defendants' contacts are substantial enough to establish minimum contacts between the Parr Defendants and Arkansas so as to permit this Court to exercise specific personal jurisdiction over the Parr Defendants.

Finally, the Court determines that, along with being authorized by Arkansas's long-arm statute, exercising personal jurisdiction over the Parr Defendants comports with the strictures of the Due Process Clause. *See World-Wide Volkswagen,* 444 U.S. at 291. The fundamental inquiry is whether the defendant has "purposefully availed" itself of the "benefits and protections" of the forum state, *see Burger King Corp.*, 471 U.S. at 482, to such a degree that it "should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp.*, 444 U.S. at 297. Here, on the record before it at this stage, the Court determines that the Parr Defendants' connections with Arkansas were not "isolated, random, fortuitous, or attenuated contacts." *Burger King Corp.*, 471 U.S. at 473. Instead, the Court determines that the Parr Defendants' contacts with Arkansas were deliberate, establishing a substantial connection with Arkansas such that the Parr Defendants could reasonably anticipate being haled into court in Arkansas.

For these reasons, the Court determines it may assert personal jurisdiction over the Parr Defendants without offending the Fourteenth Amendment. *Int'l Shoe Co. v. Washington*, 326 U.S. at 316.

## IV.    Conclusion

Viewing the facts in the record in the light most favorable to ALI, as the Court is required to do at this stage, the Court concludes that ALI has made a *prima facie* showing of personal

jurisdiction over the Parr Defendants.  The Court concludes that an exercise of personal jurisdiction over the Parr Defendants is consistent with due process, at this juncture of the litigation. Accordingly, and for the reasons explained in this Order, the Court denies the Parr Defendants' motion to dismiss for lack of personal jurisdiction (Dkt. No. 77).

It is so ordered this 11th day of May, 2022.

_____
Kristine G. Baker
United States District Judge